IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIRK ETTER,<br><br>Plaintiff,<br>v.<br><br>BARBARA JUNE ANDREWS, JAMES R. BETTS, JR., ABS-1 LLC, THE HELP GROUP OF COMPANIES, LLC, BAC FUNDING, LLC<br><br>Defendants. | ) | Civil Action No. |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff, Kirk Etter ("Etter"), files his complaint and alleges that:

**OVERVIEW**

1. This case concerns an investment scheme conducted through a web of companies all owned by Barbara June Andrews ("Andrews") and/or her business partner, James Betts, Jr. ("Betts").

2. Andrews and Betts offered and sold investments in the following companies which they individually or jointly owned or controlled: ABS-1, LLC ("ABS"), BAC Funding, LLC ("BAC"), and The Help Group of Companies, LLC ("Help Group", and collectively with ABS and BAC, the "ABS Entities"). These investments in the ABS Entities (the "ABS Investments") promised annualized effective rates of return to investors in the range of 30% and were to be repurchased by ABS at the investor's request.

3. In offering and selling the ABS Investments, Andrews and Betts represented that the ABS Entities were in the business of making loans to companies which required capital for expansion. Andrews and Betts represented that investors would be paid their promised return from the ABS Entities' profits from the loans.

4. Andrews and Betts touted the ABS Entities' success and profitability and told investors that if the ABS Entities had more capital, they could participate in more "deals." Andrews and Betts assured investors that they were investing along with them in every loan and that they and others had profitably invested in the ABS Entities.

5. Etter transferred $1,000,000 to the BAC for use in the loan program. Andrews and Betts ended up allowing this $1,000,000 to be used for FOREX trading. Andrews and Betts have not caused BAC or any of the other ABS Entities to return this $1,000,000 to Etter.

## JURISDICTION AND VENUE

6. Federal question jurisdiction exists pursuant to 28 U.S.C. §1331 because there is a count based on a federal statute, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. The remaining counts are subject to federal pendent jurisdiction.

7. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391 because a substantial portion of the events on which the claims are made occurred within this District.

## THE PARTIES

8. Etter is an individual resident of Broken Arrow, Oklahoma. Etter was a resident of Illinois at the time the investment scheme began and during a substantial portion of the events which are the subject of this Complaint.

9. Andrews is an individual resident of Bethany, Oklahoma. Andrews has never held a securities license and has never been associated with any entity registered with the United States Securities and Exchange Commission (the "Commission"). Andrews has solicited investments through the ABS Entities since at least 2005.

10. Betts is an individual resident of San Rafael, California. Upon information and belief, Betts has never held a securities license and has never been associated with any entity registered with the Commission. The State of Nevada issued an injunction against Betts arising from the sale of unregistered securities. Betts has solicited investments through the ABS Entities since at least 2005.

11. ABS is a Nevada limited liability company formed in 1998 by Andrews and Betts with its principal place of business in Bethany, Oklahoma. ABS has never registered an offering of securities with the Commission and has never been registered with the Commission.

12. BAC is a Nevada limited liability company formed in 2006 by Andrews and Betts with its principal place of business in Bethany,

Oklahoma. BAC has never registered an offering of securities with the Commission and has never been registered with the Commission.

13. Help Group is a Nevada limited liability company formed in 2007 by Andrews and Betts with its principal place of business in Bethany, Oklahoma. Help Group has never registered an offering of securities with the Commission and has never been registered with the Commission.

14. Andrews, Betts, and the ABS Entities are collectively referred to as "Defendants".

## THE ABS INVESTMENT SCHEME AS TO ETTER

15. On December 6, 2006, Andrews proposed that Etter invest $1,000,000 into BAC which would be used for the specific purpose of the loan program. Andrews and Betts told Etter that the ABS Entities used capital from investors to obtain additional funding which was used for specific “deals” which funded companies needing money for expansion but unable to qualify for traditional loans.

16. Andrews and Betts promised Etter that he would receive a 30% return on his investment.

17. On December 2, 2006, Etter transferred $1,000,000 to BAC. Etter executed a wire request to his bank for $1,000,000 pursuant to a BAC Board of Directors Resolution[1] which provided for receipt of $1,000,000 and

---

[1] BAC is a limited liability company which should have managers, not directors.

its placement in a newly opened bank account. Investment advisors owe a duty of care and an undivided duty of loyalty to their clients. *Burdett v Miller*, 957 F.2d 1375 (7th Cir. 1992). Andrews and Betts held themselves out as investment advisors to Etter and so are fiduciaries to Etter. As such Andrews and Betts owe a duty of care and a duty of loyalty to Etter which included the obligation to invest Etter's money in legitimate investments.

18. Andrews and Betts promised Etter that the $1,000,000 would be held in a segregated account and used as proof by the ABS Entities of their financial qualification for other transactions. The BAC Board of Directors resolution from BAC so provides with Etter's signature being required before the funds are in any way affected.

19. None of Andrews, Betts or any of the ABS Entities are, upon information and belief, registered to sell securities and Etter's investment in BAC was not done in accordance with applicable laws.

**POST-INVESTMENT ACTIONS**
**OF ANDREWS, BETTS AND THE ABS ENTITIES**

20. Almost immediately after Etter transferred the $1,000,000 to BAC, Andrews, Betts and the ABS Entities began a process of gaining full access to these funds. Andrews, Betts and the ABS Entities told Etter that the $1,000,000 needed to be moved to a different bank that would not allow Etter to be a co-signor on the account, but Etter's approval would still be needed in order for the funds to be "affected". This was done.

21. During the period April 14, 2008 through October 14, 2018, Andrews, Betts and the ABS Entities told Etter that his investment was secure and earning distributions. Etter was allocated "profits" for this period, but convinced to "reinvest" most of the "profits" so he received only $115,000 in "profits" payments with $397,346 in "profits" allegedly paid to a borrower under the "loan" program and $1,923 allegedly paid to a "broker" for some aspect of the investment.

22. Etter has not received a return of the 1,000,000.

**ANDREWS AND BETTS CONCEAL THEIR**
**<u>POST-INVESTMENT ACTIONS</u>**

23. In January, 2009, Andrews and Betts caused the ABS Entities to stop making quarterly allocation of "profits" to their investors.

24. Andrews and Betts first alleged that "European Banks" have changed the rules for getting unspecified things done relating to the lending business allegedly operated by the ABS Entities and this interrupted the ability to allocate profits.

25. Andrews and Betts next alleged that the ABS Entities were part of an investigation by the Commission into an individual named Jeb Boulware and as a result had their accounts frozen and were unable to make any distributions of "profits". The Commission did conduct an investigation into an individual named Jeb Boulware and as part of that investigation issued discovery to the ABS Entities, but no restrictions were placed on the ABS Entities' operations or use of funds.

26. Andrews next sought to keep the investment scheme private by demanding that investors sign a "Non-Solicitation Statement" which was really a non-disclosure agreement although the jumbled legal phrases and terms once parsed result in just an agreement preventing investors from contacting with any regulatory or law enforcement authorities. It also had investors waiving all registration and disclosure requirements for the investments. Etter did not sign this document.

**ANDREWS AND BETTS SCHEME**
**TO AVOID RETURNING THE 1,000,000**

27. On or about August 29, 2011, Etter requested that Andrews, Betts and the ABS Entities return the $1,000,000 transferred by Etter to BAC. Andrews and Betts acknowledged this request and agreed in writing to return this $1,000,000.

28. Over the next six months, Andrews and Betts spun a tale of excuses as to why the money was not returned. The story was always "once X happens in a week, then you will receive your money".

29. The first excuse was that Etter's money had been transferred to a bank in "Europe" which had transferred the money to a bank in New York, New York, but "Patriot Act" issues were delaying the release of the money to Etter. Andrews refused to provide any information that would validate her excuse, including the names of the European or the New York banks.

30. The second excuse was that in order to bypass the "Patriot Act" problems, the ABS Entities were going to borrow money and use a portion of

the loan to return the money to Etter. For weeks Andrews refused to provide any information that would allow Etter to verify her excuse, but eventually Andrews provided the name of purported lender, Ralph Devino, and an attorney who was representing him. This excuse fell apart when Etter's counsel contacted this attorney who denied knowing anything about the loan, but did confirm Mr. Devino was serving time in a federal prison for fraud.

31. The third excuse was that Andrews had to discuss the situation with "her partner", but Andrews refuses to reveal the identify of this partner. At this time, Andrews became increasingly unavailable refusing to respond to Etter or generating a variety of excuses as to why she could not discuss the matter for several days. Andrews refused to communicate with Etter's counsel, insisting that only Etter discuss the matter with her.

32. On August 29, 2012, Etter retained counsel to assist in Andrew's claim that the $1,000,000 was being sent by wire to Etter.

33. On September 28, 2012, Andrews claimed the money was sent by wire transfer to Etter, but refused to name the sending bank or provide a wire transfer confirmation number.

34. On October 1, 2012, Andrews stated that the wire confirmation number would be provided on October 3, 2012.

35. On October 3, 2012, Andrews claimed that she was not available to discuss the matter until after 3:00 on October 4, 2012.

36. On October 4, 2012, Andrews said that the wire had not in fact been sent, but would be coming from a private bank in Lichtenstein called Neue Bank. However, the wire wouldn't be sent until she talked to "her banker" which wouldn't happen until October 5, 2012 because of the difference in time zones.

37. On October 5, 6, 7, 8 and 9 2012, Andrews refused to respond to either Etter or his counsel.

38. On October 10, 2012, Andrews requested again from Etter his wire instructions and promised to send a wire request to Neue Bank.

39. On October 11, 2012, Andrews said she hadn't sent the wire request because she needed to speak again with her "personal banker". She promised to provide on October 12, 2012 confirmation that she sent the wire transfer request to Neue Bank

40. On October 12 and 13, 2012, Andrews refused to respond.

41. On October 13, 2012, Andrews provided a redacted letter addressed to Neue Bank requesting a wire transfer to Kirk Etter, but no proof that this letter was actually sent to Neue Bank.

42. On October 14, 15, 16, 17, and 18, 2012, Andrews refused to respond.

43. On October 19, 2012, Andrews refused to discuss the wire transfer, but rather promised to set up a conference call on October 22, 2012

between herself, Etter and her "personal banker" at Neue Bank. Etter's attorney was specifically excluded from this call.

44. On October 22, 2012, Andrews alleged that the "personal banker" was not available for a call.

45. On October 23, 2012, Andrews refused to respond to follow-up communications from Etter's counsel regarding the call.

46. On October 24, 2012, Andrews claimed that Etter's money was deposited at Neue Bank in an account in the name of BAC Funding, LLC with Andrews as the sole signatory.

47. On October 25, 2012, Andrews retained a criminal defense attorney and refused to further communicate with Etter.

48. On February 12, 2013, Etter filed suit in the United States District Court for the Northern District of Illinois against Defendants (the "Original Suit")

49. On or about July 26, 2013, Andrews represented to Etter that if the lawsuit were "put on hold" that "developments" would allow the $1,000,000 to be returned to Etter.

50. In reliance on Andrew's representations that the $1,000,000 would be returned if the lawsuit were "put on hold", on or about October 17, 2013, Etter voluntarily dismissed without prejudice the Original Suit.

51. During the period from October 18, 2013 to July 27, 2016, Andrews reported to Etter that she was making arrangements for the return

to Etter of the $1,000,000. Etter received no money from Andrews, Betts or the ABS Entities during this period.

52. Andrews requested more time to return the $1,000,000 to Etter. On July 28, 2016, Etter entered into a Tolling Agreement with Defendants (the "Tolling Agreement") which tolled the statute of limitations as to all claims in order to give Andrews the time she claimed was required for the "developments" that would allow $1,000,000 to be paid to Etter.

53. During the period from July 28, 2016 to July 1, 2017, Andrews reported to Etter that she was making arrangements for the return to Etter of the $1,000,000. Etter received no money from Andrews, Betts or the ABS Entities during this period.

54. Andrews requested more time to return the $1,000,000 to Etter. On July 1, 2017, the Tolling Agreement was extended to allow Andrews the time she now claimed was required for a different "development" that would allow $1,000,000 to be paid to Etter.

55. During the period from July 1, 2017 to July 1, 2018, Andrews reported to Etter that she was making arrangements for the return to Etter of the $1,000,000. Etter received no money from Andrews, Betts or the ABS Entities during this period.

56. Andrews requested more time to return the $1,000,000 to Etter .On July 1, 2018, the Tolling Agreement was extended to allow Andrews the time for another plan to allow $1,000,000 to be paid to Etter.

57. During the period from July 1, 2018 to July 1, 2020, Andrews reported to Etter that she was making arrangements for the return to Etter of the $1,000,000. Etter received no money from Andrews, Betts or the ABS Entities during this period.

58. Andrews requested more time to return the $1,000,000 to Etter. On July 1, 2020, the Tolling Agreement was extended to allow Andrews the time for yet another plan to allow $1,000,000 to be paid to Etter.

59. During the period from July 1, 2020 to July 1, 2022, Andrews reported to Etter that she was making arrangements for the return to Etter of the $1,000,000. Etter received no money from Andrews, Betts or the ABS Entities during this period.

60. Andrews requested more time to return the $1,000,000 to Etter. On July 1, 2022, the Tolling Agreement was extended to allow Andrews the time to develop a plan to allow $1,000,000 to be paid to Etter.

61. During the period from July 1, 2022 to July 1, 2024, Andrews reported to Etter that she was making arrangements for the return to Etter of the $1,000,000. Etter received no money from Andrews, Betts or the ABS Entities during this period.

62. Andrews requested more time to return the $1,000,000 to Etter. On July 1, 2024, the Tolling Agreement was extended to allow Andrews the time execute a specific plan she said existed for the return of $1,000,000 Etter.

63. At this point, Etter's counsel sought information from Andrews about the "deal" that was allegedly in process and would result in $1,000,000 being paid to Etter.

64. On September 14, 2024, Etter's counsel sent Andrews a demand for information about the latest plan and set a deadline of Noon on September 16, 2024.

65. Andrews responded by requesting more time to respond.

66. Over the next two weeks, Etter's counsel repeatedly followed-up with Andrews who responded with a series of excuses as to why she did not respond promptly and why she couldn't provide the requested information, including that there was a confidentiality agreement regarding the alleged transaction that would repay Etter; that she could communicate only with Etter; and that she could not communicate with anyone because of the potential for litigation.

67. As of the date of this complaint, Andrews has not provided any information about the alleged transaction that is supposed to provide the $1,000,000 to be paid to Etter nor has Andrews offered to make even a nominal interim payment to Etter.

## COUNT I— INJUNCTION
### Against All Defendants

68. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

69. Andrews, Betts and the ABS Entities, unless restrained and enjoined by this Court, will likely continue to engage in the transactions, acts, practices, and courses of business alleged in this Complaint and will transfer their assets beyond the reach of this Court.

70. Upon information and belief, Andrews has control over assets including (a) a bank account at Neue Bank; (b) a bank account at Chase Bank; (c) equity in the ABS Entities; and (d) real property at 2510 N. Rockwell Avenue, Bethany Oklahoma 73008 (collectively, items (a) through (d), the ("Andrews Property").

71. Upon information and belief, Betts has control over assets including (a) equity in the ABS Entities; and (b) real property at 1331 Las Raposas Road, San Rafael, California 94903 (collectively, items (a) through (b), the ("Betts Property").

72. Upon information and belief, the ABS Entitles have control over assets including (a) a bank account at Neue Bank; (b) a bank account at Chase Bank; and (c) a bank account at Bank of America (collectively, items (a) through (c), the "ABS Entities Property").

WHEREFOR, Etter requests entry of an order against each of Defendants enjoining them from transferring any of the Andrews Property,

Betts Property or the ABS Entities Property, making findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, and such other relief as may be just and proper.

## COUNT II— CONSTRUCTIVE TRUST
## Against All Defendants

73. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

74. A constructive trust is a remedy at equity. "When a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not to retain it, a constructive trust can be imposed to avoid unjust enrichment". *Smithberg v. Ill. Municipal Retirement Fund*, 192 Ill.2d 291, 299 (2000).

75. There are two essential elements for a constructive trust: (a) the existence of identifiable property to serve as the res upon which a trust can be imposed; and (b) possession of that res or its product by the person whom is to be charged as the constructive trustee. *People ex. rel. Neil F. Hartigan v. Candy Club*, 149 Ill.App.3d 498, 502 (1986).

76. At the pleading stage, a plaintiff is not required to make detailed assertions as to where the money or property is to be found, provided that the complaint alleges that the money was misappropriated in some specific form. *Center For Pain Control v. Karen S. McCall*, 2012 Il App(2d) 110649-U, March 23, 2012, Appellate Court of Illinois Second District.

77. As described in paragraphs 70 through 72 above, Defendants have control over specific and identifiable assets. This Complaint alleges that Etter's money was misappropriated and Andrews admits it was transferred to other bank accounts.

WHEREFOR, Etter requests entry of an order against each of Defendants imposing a constructive trust on the Andrews Property, Betts Property and the ABS Entities Property plus such other relief as may be just and proper.

**COUNT III—FRAUD**
**Common Law**
**Against All Defendants**

78. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

79. A cause of action for common law fraud has the following elements: (a) a false statement of material fact; (b) defendant's knowledge that the statement was false; (c) defendant's intent to induce plaintiff to act on the false statement; (d) plaintiff's reliance on the statement; and (e) plaintiff's damages from relying on the false statement. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.App3d 642, 648, 260 Ill.Dec. 735, 762 NE 2d 1 (2001). The concealment of a material fact may substitute for the element of a false statement of a material fact where defendant knew and intended that the plaintiff would be influenced by not knowing the concealed fact.

*Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill.App.3d 154, 510 N.E.2d 409, 413; 109 Ill.Dec. 541, 545 (1st Dist. 1986).

80. Defendants falsely represented to Etter among other things that (a) the $1,000,000 was to be invested in “loans” then “bonds” when, upon information and belief, it actually was used for foreign exchange trading; (b) the periodic payments he received in 2007 and 2008 were profits from the ABS Entities; (c) in 2012 the $1,000,000 was wired to Etter; and (d) for over ten years there have been legitimate delays in returning the $1,000,000 (collectively, the "False Statements").

81. Defendants knew that the False Statements were false because they controlled the $1,000,000, their own actions, and the actions of the ABS Entities.

82. Defendants intended that Etter rely on the False Statements and concealed the true nature of the investment scheme in order that Etter transfer the $1,000,000; Andrews, Betts and the ABS Entities gain full control over the $1,000,000 unfettered by Etter; and avoid returning the $1,000,000.

83. Etter did rely upon the False Statements and transferred $1,000,000 to BAC then waited over ten years and after multiple Tolling Agreements before filing this Complaint..

84. Etter has been damaged by relying on the False Statements because he has been deprived of $1,000,000 plus lost interest income thereon.

WHEREFOR, Etter requests entry of a judgment against Defendants, jointly and severally, for $1,000,000 in actual damages, plus punitive damages of not less than $1,000,000 plus pre-judgment interest and post-judgment interest at 9% per annum, plus court costs and attorney fees to be proven at trial plus such other relief as may be just and proper.

**COUNT IV—FRAUD**
**Violations of Section 10(b) of the Exchange Act**
**15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5**
**Against All Defendants**

85. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

86. From at least October 2006 through October 2012, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, as all more particularly described above.

87. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged

in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

88. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

WHEREFOR, Etter requests entry of a judgment against Defendants, jointly and severally, for $1,000,000 in actual damages, plus punitive damages of not less than $1,000,000 plus pre-judgment interest and post-judgment interest at 9% per annum, plus court costs and attorney fees to be proven at trial plus such other relief as may be just and proper.

**COUNT V— UNJUST ENRICHMENT**
**Against All Defendants**

89. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

90. A claim for unjust enrichment requires that (a) defendant unjustly retained a benefit to the plaintiff's detriment and (b) the defendant's retention violated the fundamental principles of justice, equity, and good conscience. *Board of Managers of Hidden Lake Townhome Owners Ass'n v. Green Trails Improvement Ass'n*, 4040 Ill.App3d 184, 193 (2010).

91. Defendants have possession and control over the $1,000,000 and have had such control since October 2006. Due to such possession and

control, Defendants have earned and retained interest or other profits on the $1,000,000.

92. Defendants retention of the $1,000,000 and the interest and profits on the $1,000,000 violates the fundamental principles of justice, equity and good conscience because the investment scheme purported to distribute profits when it was instead has delayed Etter from taking legal action to recover the $1,000,000.

WHEREFOR, Etter requests entry of a judgment against Defendants, jointly and severally, for actual damages to be proved at trial plus pre-judgment interest and post-judgment interest at 9% per annum, plus court costs and attorney fees to be proven at trial plus such other relief as may be just and proper

**COUNT VI— CONVERSION**
**Against All Defendants**

93. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

94. A cause of action for conversion has the following elements: (a) plaintiff has a right to the property; (b) plaintiff has an absolute and unconditional right to the immediate possession of the property; (c) plaintiff has made a demand for possession; and (d) defendant has wrongfully and without authorization assumed control, dominion or ownership over the property. *Cirrincione v. Johnson*, 184 Ill.2d 109, 114 (1998).

95. Money may be the subject of a claim for conversion where plaintiff shows that shows that the money claimed, or its equivalent, at all times belonged to plaintiff and that the defendant converted it to his or her own use. *The Film and Tape Works, Inc. v. Junetwenty Films, Inc.*, 368 Ill.App 3d 462 (1st Dist 2006).

96. Defendants have taken $1,000,000 belonging to Etter by transferring this money without Etter's consent in violation of Defendants' promises to keep this $1,000,000 in a segregated account subject to Etter's control.

97. Etter has the absolute and unconditional right to the $1,000,000 taken by Defendants because the money originated in his account at First Midwest Bank.

98. Etter has made demand on Defendants for possession of the $1,000,000.

99. Defendants have refused to return the $1,000,000 to Etter thereby continuing to wrongfully retain control over this money.

WHEREFOR, Etter requests entry of a judgment against Defendants, jointly and severally, in the amount of $1,000,000 in principal plus pre-judgment interest and post-judgment interest at 9% per annum, plus court costs and attorney fees to be proven at trial plus such other relief as may be just and proper.

## COUNT VII—BREACH OF FIDUCIARY DUTY
**Against Defendants Andrews and Betts**

100. Paragraphs 1 through 67 are incorporated herein by reference.

101. A cause of action for breach of fiduciary duty has the following elements (a) a fiduciary relationship exists between the parties; (b) defendant owed a particular fiduciary duty to plaintiff; (c) defendant breached this fiduciary duty; and (d) defendant's breach of this fiduciary duty caused damage to plaintiff. *Martin v. Heinhold Commodities, Inc.*, 163 Ill.2d 33, 643 NE2d 734, 205 Ill.Dec 443 (1994). The most common types of fiduciary duty involved in breach claims are the good faith and a duty of loyalty. *See e.g. Bennett v. Weber*, 3232 Ill 283, 154 NE 105 (1926) and *Holyoke v. Continental Illinois National Bank & Trust Co.* , 246 Ill. App 284, 104 Ne2d 838 (1st Dist 1952).

102. Investment advisors owe a duty of care and an undivided duty of loyalty to their clients. *Burdett v Miller*, 957 F.2d 1375 (7th Cir. 1992). Andrews and Betts held themselves out as investment advisors to Etter and so are fiduciaries to Etter. As such Andrews and Betts owe a duty of care and a duty of loyalty to Etter which included the obligation to invest Etter's money in legitimate investments.

103. Andrews and Betts breached their fiduciary duties of care and loyalty by:

(a)making material misrepresentations in order to convince Etter to transfer $1,000,000 to BAC;

(b) failing to invest the 1,000,000 in "loans" or even "bonds";

(c) obfuscating the status of the $1,000,000 through the use of legal and financial "gibberish";

(d) attempting to get Etter to sign a non-disclosure agreement that would have effectively prevented Etter from taking action to recover the 1,000,000;

(e) excluding Etter's counsel from communications;

(f) failing to maintain accounting records; and

(g) making misrepresentations and failing to disclose material facts regarding the return of the $1,000,000.

104. The various breaches of the Andrews and Betts' fiduciary duties to Etter as described in paragraph 103 above proximately caused harm to Etter by:

(a) depriving him of money and income from that money; and

(b) causing him to incur legal fees to recover his money.

WHEREFOR, Etter requests entry of a judgment against Andrews and Betts, jointly and severally, in an amount not less than $1,000,000 in actual damages, plus punitive damages of not less than $1,000,000 plus pre-judgment interest and post-judgment interest at 9% per annum, plus court

costs and attorney fees to be proven at trial plus such other relief as may be just and proper.

## COUNT VIII—CIVIL CONSPIRACY
**Against All Defendants**

105. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

106. A claim of civil conspiracy requires (a) a combination of two or more persons; (b) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (c) in furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Time Savers, Inc. v. LaSalle Bank NA,* 371 Ill.App3e 759, 772-73 (2007)

107. A plaintiff is not required to plead with specificity and precision the facts that are within the defendant's control and knowledge. The complaint must set forth sufficient facts from which the existence of a conspiracy may be properly inferred. *Time Savers*, at 772.

108. Andrews and Betts knowingly (a) entered into an agreement to solicit investors without either (i) any intention of actually investing the money; or (ii) the competence to invest the money; (b) did raise money from investors based on misrepresentations and omissions of material facts; (c) did pay "profits" to investors using, upon information and belief, investor principal; and (d) have unlawfully retained possession of the 1,000,000.

WEREFORE, Etter requests entry of a judgment against Defendants, jointly and severally, for $1,000,000 in actual damages, plus punitive damages of not less than $1,000,000 plus pre-judgment interest and post-judgment interest at 9% per annum, plus court costs and attorney fees to be proven at trial plus such other relief as may be just and proper.

## COUNT IX— BREACH OF CONTRACT
## Against All Defendants

109. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

110. A claim of breach of contract requires and offer, acceptance and consideration. *Hernandez v. Illinois Institute of Technology,* No. 22-1741, (N.D.IL March 27, 2023).

111. Andrews offered Etter what was represented to be an investment opportunity in BAC. Etter accepted the investment opportunity. Etter transferred and BAC received $1,000,000 from Etter, which included the $1,000,000. This formed a contract (the "Contract") Upon information and belief, the ABS Entities are alter egos of Andrews and/or Betts.

112. Andrews, Betts and the ABS Entities breached the Contract by, among other things, (a) failing to preserve the $1,000,000; (b) failing to invest the $1,000,000 in the agreed upon investments; and (c) failing to return the $1,000,000, including the $1,000,000.

WEREFORE, Etter requests entry of a judgment against Defendants, jointly and severally, for $1,000,000 in actual damages, plus pre-judgment

interest and post-judgment interest at 9% per annum, plus court costs and attorney fees to be proven at trial plus such other relief as may be just and proper

**COUNT X— NEGLIGENCE**
**Against All Andrews and Betts**

113. Paragraphs 1 through 67 are hereby re-alleged and are incorporated herein by reference.

114. A claim of negligence requires (a) a duty of care; (b) a breach of the duty of care; (c) the breached caused damages; and (d) damages. *Hardimon v. Am. River Transp.*, 95 F4th 1130 (7th Cir. 2024)

115. Andrews and Betts had a duty of care to Etter. Investment advisors owe a duty of care and an undivided duty of loyalty to their clients. *Burdett v Miller*, 957 F.2d 1375 (7th Cir. 1992). Andrews and Betts held themselves out as investment advisors to Etter and so are fiduciaries to Etter. As such Andrews and Betts owe a duty of care and a duty of loyalty to Etter which included the obligation to invest Etter's money in legitimate investments.

116. Andrews and Betts breached their duty of care to Etter by, among other things (a) failing to preserve the $1,000,000; (b) failing to invest the $1,000,000 in the agreed upon investments; (c) failing to pursue recovery of the $1,000,000; (d) failing to do proper investigation into prospective and actual business counter-parties; (e) failing to keep Etter's counsel informed of events; (f) misrepresenting the status of the multiple times that the

$1,000,000 was alleged to be in the process of being returned to Etter; and (g) failing to keep proper accounting and other business records.

117. Andrews and Betts breach of their duty of care was the cause of damages to Etter in that Andrews and Betts, either directly or through the ABS Entities, have control over the $1,000,000 and not returned it to Etter.

118. Etter has suffered damages as a result of Andrews and Betts breach of their duty of care in that he has not received the $1,000,000, has lost over ten years' worth of income on the $1,000,000, and has incurred attorney fees and costs in seeking to recover the $1,000,000.

WEREFORE, Etter requests entry of a judgment against Defendants, jointly and severally, for $1,000,000 in actual damages, plus pre-judgment interest and post-judgment interest at 9% per annum, plus court costs and attorney fees to be proven at trial plus such other relief as may be just and proper

Dated: October 15, 2024

Respectfully submitted,
KIRK ETTER

/s/ B. Lane Hasler

Attorneys For Plaintiff
B. Lane Hasler
161 N. Clark
Suite 1600
Chicago, IL 60601
312-953-4914
lanehasler@blhlo.com

VERIFICATION

Under penalties as provided by law, pursuant to Section 1–109 of the Illinois Code of Civil Procedure (735 ILCS 5/1-109), the undersigned certifies that the statement set forth in this Petition are true and correct.

Dated: 10 - 14, 2024

______________________
Plaintiff, by Kirk Etter